IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| IN RE FX ENERGY, INC. SECURITIES LITIGATION | ORDER and MEMORANDUM DECISION<br><br>Master File No. 2:07-CV-874 CW (Consolidated with 2:07-CV-938 DAK and 2:07-CV-966 DAK) |

This is an action against FX Energy, Inc. and several of its directors and officers brought by several shareholders who allege violations of federal securities statutes. Now before the court is Defendants' motion to dismiss Plaintiffs' consolidated complaint. For the reasons explained below, this motion is GRANTED.

## BACKGROUND

Plaintiffs Frank and Susan Christopher, Joe and Jeanne Glennon, Ted Melhado, and Elvin Wright have brought this action alleging securities fraud against Defendants. Defendant FX Energy is an oil and gas company based in Utah. Defendants Scott J. Duncan, Richard Hardman, Thomas B. Lovejoy, Clay Newton, Andrew W. Pierce and David N. Pierce are directors and officers of FX Energy. Plaintiffs bring this action as a putative class action, seeking to represent themselves and all other persons or entities who purchased common stock of FX Energy during the period of January 20, 2005 through January 5, 2006. This case has been consolidated with cases that were pending before other judges in this district. In Count I of their consolidated complaint, Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 promulgated thereunder. In Count II, the

Plaintiffs allege that Defendants violated Section 20(a) of the Act.

FX Energy's main operations occur in Poland, where FX Energy works with the Polish Oil and Gas Company ("POGC"). At issue in this case are two projects in which FX Energy and POGC worked together to drill exploratory wells. Those wells are known as "Lugi-1" and "Sroda-5" and are located in areas in Poland called "Fences I" and "Fences II." As support for their fraud claims, Plaintiffs allege that Defendants made eight press releases and conducted one investor presentation containing material misrepresentations about the prospects of finding gas in the wells at issue. These allegedly false statements were made between January 20, 2005 and October 10, 2005.

Plaintiffs assert two main misrepresentations in Defendants' statements. First, Plaintiffs maintain that the press releases and slide presentation "constituted false representations to reasonable investors that Defendants' decision to drill for gas at two particular sites in Poland, known as Lugi-1 and Sroda-5, was based on well-established scientific and geological data." (Compl. ¶ 21.) Specifically, Plaintiffs argue that Defendants used two dimensional, or 2D, seismic data when they should have used three dimensional, or 3D seismic data, which Plaintiffs assert is superior. (See id. ¶ 22.)[1] Next, Plaintiffs contend that Defendants "repeatedly touted" "the proximity of the Sroda-5 and Lugi-1 wells to prior successful drilling sites" as a "significant fact or indicator that gas could be located at Sroda-5 or Lugi-1." (Id. ¶ 23.) Plaintiffs allege that

---

[1] In addition to arguing that the documents make this statement, Plaintiffs contend that FX Energy's "decision to drill at all constituted a misrepresentation that the Company had a well-established scientific and geologic basis for doing so." (Pls.' Memo. in Opp. to MTD at 3.) Plaintiffs cite no authority supporting the proposition that a court may equate a corporate decision to take an action with a representation to the market. Accordingly, the court will not consider this argument here.

Defendants knew that this representation was not true.  (See id.)

Defendants made the first press release to which the complaint refers on January 20, 2005.  In the complaint, Plaintiffs focus on the following language in that press release:

> Richard Hardman, head of the technical team for FX Energy stated, "The presence of gas in the Rusocin-1 well has important implications for the prospectivity of Fences I where a major pinchout play against the Wolsztyn Basement High has been recognized in the south of the block.  Rusocin was the first test of the concept. Recently FX obtained new seismic data over the Lugi extension of the play to the southeast and also over Dolsk to the west of Rusocin.  Since the play has been positively established by Rusocin-1, both of these now appear lower risk.  There are also other opportunities along this trend in the immediate vicinity of the well."

(Id. ¶ 26.)

Defendants issued the second press release on February 2, 2005.  In their complaint, Plaintiffs cite the following reference to the Lugi well from the press release:  "FX Energy also announced that a drillsite has been selected for the Lugi prospect in the Company's Fences II project area.  Lugi is the next well to be drilled on a pinchout target following the Ruscosin-1 well that has been completed for production and will be tested to determine the extent of the reservoir."  (Id. ¶ 27.)

Defendants issued the third press release on March 3, 2005.  Plaintiffs emphasize the following statement in their complaint: "FX Energy and POGC have approved drilling the Lugi well as the next test of the pinchout play.  The location has been approved and verified by surveyors and formal procedures leading to a contract tender will begin next week.  The well is expected to spud in a June/July timeframe."  (Id. ¶ 28.)

The fourth press release at issue was made on May 2, 2005.  In their complaint, Plaintiffs recite following language from that press release:

3

> The Company will meet with its partner, the Polish Oil and Gas Company (POGC), later this month to firm up plans to drill the Sroda-5 well and acquire new 2D and 3D data over a number of structures in the Sroda vicinity, including Sroda, Sroda NE and Winna Gora. "Sroda-4 has established a significant column of producible gas and confirms that excellent reservoir properties exist in the aeolian facies of the Rotliegendes (Lower Permian) at this depth. The 33 meter gas column coincides with the mapped closure which indicates that the potential gas accumulation may be as large as the Company's estimated unrisked gross maximum of 400 bcf. The success of Sroda reduces the risk of other similar structures in the vicinity and will lead to an active exploratory drilling campaign in Fences II," said Richard Hardman, head of FX Energy's technical team.
>
> In a technical presentation earlier this month FX Energy reported that the Company believes the proposed seismic program in the Sroda area alone will provide drilling targets on structures that may contain unrisked estimated maximum potential of approximately 1.5 tcf of gas.

(Id. ¶ 29.)

The fifth of the subject press releases was issued on May 11, 2005. Included in the complaint are the following statements from that press release:

> The Sroda-5 well, the Company's next well in the Fences II project area will be drilled as an appraisal well on the Sroda structure. Work is currently underway to determine the exact location prior to beginning permitting the Sroda-5 well.
>
> The next well to begin drilling under the Company's current operational plans is the Lugi well which is currently in the tender process to select a drilling company.

(Id. ¶ 30.)

The next allegedly fraudulent statements were made by FX Energy in a July 7, 2005, slide presentation that the company gave at the IPAA Oil and Gas Investment Symposium. Specifically, Plaintiffs include the following statements in the slide presentation in their complaint:

> (a)   "Each Sroda area well (Sroda-5, Sroda NE, etc.) should add approx. $2 mm/yr for FX"
>
> (b)   "expected drilling success rate: 50%; (FX is 3 for 3 since using modern

4

          technology; SNS rate is 53.4%)"

(c)     Under the heading: "Three discoveries; two exploration models confirmed; production starts in 2006", "Sroda: expect production in 2007 with several wells"

(d)     "over $30 million cash to focus on lowest risk areas (Sroda now, pinch-out after Lugi)"

(e)     "Sroda discovery increases success outlook for Sroda and nearby structures with 1+ Tcf potential"

(f)     "Rusocin discovery confirms presence of pinch-out play type with 1+ Tcf potential"

(g)     "Sroda-4 discovery (May'05) sets up a cluster of nearby structural traps; gross potential 1+ Tcf of gas; Sroda-5 and possibly Sroda-6 to drill in 2005"

(h)     "Lugi well could establish a major pinch-out stratigraphic play extending southeast from the recent Rusocin discovery (Jan'05); gross potential 1+ Tcf of gas"

(i)     "Excellent record of exploration success: three discoveries in a row!"

(Id. ¶ 31.)

Plaintiffs allege that these statements "are misleading because the predictions of success at it [sic] the Sroda-5 and Lugi sites omit material information needed by investors to truly evaluate these prospects," referring to 2D seismic data Plaintiffs contend was outdated and unreliable. (Id. ¶ 32.) Plaintiffs further allege that "these statements are misleading because the Company represents that the Lugi [and] Sroda-5 sites have a higher probability of success because of their proximity to production wells – even going so far as to tell investors to *expect production* in 2007 from several wells in Sroda." (Id.)

The FX Energy press release to which the Plaintiffs next cite is dated July 18, 2005. Plaintiffs' complaint includes following language from this press release:

> FX Energy. . . reported today that the Board of the Polish Oil and Gas Company (POGC), has approved for tender the drilling of the Sroda-5 and Lugi-1 wells. In addition, the Board approved for tender the acquisition of approximately 400 km of 2D seismic in the Fences I and II areas.
>
> The Sroda-5 well will be drilled southeast of the successful Sroda-4 discovery that was completed earlier this year. The Lugi-1 well will test a pinchout target approximately 9 km east of the Rusocin-1 discovery well that was completed in late 2004. FX Energy owns a 49% interest in the wells; POGC is the operator and owns a 51% interest.
>
> "We are very pleased to be drilling a second well in the Sroda area following our successful Sroda-4 discovery and to be acquiring additional seismic over a number of prospects, including the Winna Gora and Sroda Northeast prospects, that we believe will generate drilling locations for the continued exploration and development in Fences II. . ."

(Id. ¶ 33.)

FX Energy made the seventh and eighth press releases containing alleged misrepresentations on August 24, 2005 and October 10, 2005 respectively. (See id. ¶ 34.) Plaintiffs do not cite any specific language from these releases in their complaint, instead making general characterizations about what is contained in them. (See id.)

On December 20, 2005, FX Energy made another announcement concerning the Lugi-1 well. In their complaint, Plaintiffs highlight the following portions of that release:

> FX Energy. . . announced today that test results on the Lugi-1 well in western Poland were determined to be uneconomic and that the well will be plugged and abandoned. "This well trapped and tested gas from a thin section of the Rotliegend target reservoir but is not economic," said Andy Pierce, FX Energy's COO. "Our technical team will use the results of this well to help evaluate the future potential of the pinchout target in our Fences I area," continued Mr. Pierce.
>
> . . . Until the well results are better understood, the impact of the well on the major Rusocin – Lugi pinchout play can not be fully determined."
>
> The Sroda-5 well is currently being cased to the top of the Rotliegend at a depth of 3,510 meters. Once the casing has been cemented, the well will be cored and tested. The Polish Oil and Gas Company owns a 51% interest in the Lugi-1 and Sroda-5 wells and is the operator; FX Energy owns 49%.

(Id. ¶ 37.) Plaintiffs do not allege that these statements are false.

On January 17, 2006, FX Energy issued a press release concerning the Sroda-5 well. Plaintiffs emphasize the following language from that release:

> FX Energy. . . reported today that a drill stem test on the Sroda-5 well in western Poland in a sixteen meter section of the Rotliegend target reservoir tested gas and brine in a short test early today. The well will continue to be tested and additional drilling will take place before commerciality of the well can be determined.

(Id. ¶ 39.) Plaintiffs likewise do not contend that these were false statements.

After FX Energy's share value fell in the wake of these announcements, several shareholders filed suit in the District of Utah. As mentioned, those cases were consolidated, and this court now has Defendants' motion to dismiss the consolidated complaint of the lead plaintiffs before it.

## ANALYSIS

**I.   Motion to Dismiss Standards in Securities Fraud Cases**

When evaluating a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court presumes the truth of all well-pleaded facts in the complaint, but need not consider conclusory allegations. Tal v. Hogan, 453 F.3d 1244, 1252 (2006), cert. denied, 127 S. Ct. 1334 (2007); Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976). Conclusory allegations are allegations that "do not allege the factual basis" for the claim. Brown v. Zavaras, 63 F.3d 967, 972 (10th Cir. 1995). See also Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."). The court is not bound by a complaint's legal conclusions, deductions and opinions couched as facts. Bell

Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). Further, though all reasonable inferences must be drawn in the non-moving party's favor, Tal, 453 F.3d at 1252, a complaint will only survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1969, quoted in Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Aschroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (citations omitted). Under this standard, a claim need not be probable, but there must be facts showing more than a "sheer possibility" of wrongdoing. Id.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.A. § 78u-4(b), along with Rule 9(b) of the Federal Rules of Civil Procedure, mandate that plaintiffs in securities fraud actions are subject to heightened pleading standards. See, e.g., Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095-96 (10th Cir. 2003). Generally, any plaintiff pleading fraud must do so with sufficient particularity. See Rule 9(b). But plaintiffs in securities fraud cases have two additional burdens. First, a "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id. at 1095, quoting 15 U.S.C.A. § 78u-4(b)(1). Second, rather than pleading scienter generally, as allowed in other fraud cases, plaintiffs alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Adams, 340 F.3d at 1096, quoting 15 U.S.C.A. § 78u-4(b)(2). The court must dismiss complaints that do not meet these

8

requirements. See 15 U.S.C.A. § 78u-4(b)(3).

To decide whether a plaintiff satisfies the particularity requirement, the court must "evaluat[e] the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." Adams, 340 F.3d at 1099. Relevant factors in making this determination include:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

Id. (citation omitted). If, after considering these factors, the court concludes that "a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." Id.

To plead scienter with sufficient particularity under the PSLRA, a plaintiff must, "'with respect to each act or omission[,] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. at 1096, quoting 15 U.S.C. § 78u-4(b)(2). This is a "stringent" requirement. Adams, 340 F.3d at 1096. A "'strong inference' of scienter" means "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." Id. at 1105. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud" and "knowing or intentional conduct." City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1258 (10th Cir. 2001) (quotations and citation omitted). Recklessness can satisfy the scienter requirement, but

"[c]ourts have been cautious about imposing liabilities for securities fraud based on reckless conduct." Id. at 1260. Recklessness is "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. at 1258 (quotations and citation omitted). In contrast, negligence is not a sufficient mental state. See id.

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, __, 127 S. Ct. 2499, 2509 (2007). This is "an inherently comparative inquiry" that "cannot be decided in a vacuum." Id. at 2510. Therefore, "a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. In so doing, "the inference of scienter must be more than merely 'reasonable' or 'permissible'-it must be cogent and compelling, thus strong in light of other explanations." Id. But the "inference that defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id. (citations omitted). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. When considering this question, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Id. at 2511.

If a complaint relies on documents to make its claims but does not attach copies of those documents, a court may nonetheless consider those documents if the defendants provide indisputably authentic copies of them. See GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384-85 (10th Cir. 1997). "If the rule were otherwise, a plaintiff with a deficient

claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." Id. at 1385. See also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808-09 (2nd Cir. 1996) (considering full text of documents including press releases in analyzing federal securities fraud action). If the documents on which the Plaintiffs rely "contradict the allegations of the . . . complaint, the documents control and [a] Court need not accept as true the allegations in the . . . complaint." Rapoport v. Asia Elecs. Holdings Co., Inc., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). See also Roth v. Jennings, 489 F.3d 499, 505 (2nd Cir. 2007) (citing Rapoport with approval).

## II. Elements of Plaintiffs' Securities Fraud Claims

Plaintiffs' first claim is a violation of Section 10(b) of the Exchange Act, 15 U.S.C.A. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. To successfully plead such a claim, a plaintiff must allege that defendants:

> (1) made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiff relied; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss.

In re Williams Secs. Litig.- WCG Subclass, 558 F.3d 1130, 1136 (10th Cir. 2009), citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 768 (2008).

Count II alleges a claim under Section 20(a) of the Act. Under Section 20(a), a person who "directly or indirectly" controls any person who commits a violation of the securities laws may be held jointly and severally liable with the primary violator. 15 U.S.C.A. § 78t(a). To "state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged

controlling person." Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998) (citations omitted).

### III.     Plaintiffs Have Not Adequately Plead Securities Fraud

#### A.     Plaintiffs Have Not Sufficiently Plead Fraudulent Statements or Omissions

As mentioned above, Plaintiffs's alleged misrepresentations and omissions boil down to two key assertions. First, Plaintiffs assert that Defendants relied on outdated and unreliable 2D technology in deciding to drill at Lugi-1 and Sroda-5, but represented to the market that they were making decisions based on the latest 3D technology. Second, Plaintiffs maintain that Defendants represented to the market that the two wells had a greater chance of being successful because of the success of wells in their vicinity, which the Defendants knew was not true. The court will analyze these assertions in turn.

Plaintiffs maintain that each of the press releases and the slide presentation contained the first misrepresentation. But a careful review of these documents, even one limited to the portions quoted in the complaint, does not bear out this argument. Nowhere in any of the documents cited by Plaintiffs do the Defendants expressly assert that FX Energy was using the latest 3D technology at Lugi-1 or Sroda-5 or that 2D technology was not being used at those wells. Accordingly, the actual documents contradict the Plaintiffs' characterizations of them in the complaint, so the court is not obliged to credit those allegations as true. See Rapoport, 88 F. Supp. 2d at 184.

Moreover, even reading these documents in the light most favorable to Plaintiffs, the court cannot find any statements that reasonably imply that FX Energy was using 3D seismic data. The court found only three instances in which it could be plausibly argued that Defendants

had made such an implied statement. First is the May 5, 2005 press release, which states that FX Energy intended to "firm up plans" to "acquire new 2D and 3D data over a number of structures in the Sroda vicinity, including Sroda, Sroda NE and Winna Gora." (Compl. ¶ 29.) But on its face, this statement fails to mention Lugi-1 or Sroda-5. And even if the press release were read to refer to Sroda-5 or Lugi-1 as included wells, the release clearly refers to the acquisition of 2D and 3D data as a plan that needed to be further developed, rather than as a current event. But fraud must be based on statements of purported existing fact, not statements of plans for future actions such a possibly obtaining 3D data. See, e.g., In re Moody's Corp. Secs. Litig., 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) ("To be actionable, a misrepresentation must be 'one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention.'") (citation omitted).[2]

Second, the July 7, 2005 slide presentation contains the statement that "FX is 3 for 3 since using modern technology." Plaintiffs do not explain what other portions of the slide presentation would support the inference that "modern technology" referred to using 3D images. Nor did the court locate any such support. If anything, it would be the most reasonable to read those words to reflect Defendants' belief that the technology they had used in analyzing their three successful wells was adequate and reliable. And Plaintiffs allege that Defendants were

---

[2] There is a limited exception to this general rule. A plaintiff may state a cause of action for fraud by alleging that a defendant made "misleading statements of subjective analysis or extrapolation, such as opinions, motives or intentions, or forward looking statements, such as projections, estimates and forecasts may be actionable if the speaker does not genuinely and reasonably believe them when made." In re Adolor Corp. Secs. Litig., - - - F. Supp. 2d - - -, 2009 WL 1312564, *10 (E.D. Pa. May 8, 2009) (citation omitted). Plaintiffs, however, have not attempted to plead within this exception.

using only 2D data.

Third, the July 18, 2005 press release mentions that FX Energy's board had "approved for tender the acquisition of approximately 400 km of 2D seismic in the Fences I and II areas," and later states that FX Energy was "pleased" to "be acquiring additional seismic over a number of prospects." (Id. ¶ 33.)  But these statements cannot reasonably be read as stating that 3D is being used at Lugi-1 and Sroda-5 or that 2D is not being used in those wells.  If anything, this press release appears to directly contradict Plaintiffs' allegation by stating that the company was using 2D in large portions of Fences I and II.

In sum, the court finds that none of the press releases or slide presentation made during the relevant time period can reasonably be read to imply that FX Energy was using 3D technology at Lugi-1 or Sroda-5.  To the contrary, the non-specific references to 2D and 3D in those documents give one the impression that FX Energy was generally using 2D but had plans to use 3D at some future time.  The court is not required to accept as true allegations that are rebutted by the actual documents.  See Rapoport, 88 F. Supp. 2d at 184.

On a related note, Plaintiffs allege that it was a material omission for Defendants not to include the type of seismic technology being used at Lugi-1 and Sroda-5 in the July 5, 2005 slide presentation.  But Plaintiffs have not pled facts showing that FX Energy had a duty to disclose this information in that slide show.  "[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 998 (10th Cir. 2002) (citation and internal quotation marks omitted).  The court did not find any discussion in the slide presentation (which Defendants attached as an exhibit to their briefing) about whether FX Energy

14

was using 2D or 3D seismic data at the relevant wells, or about whether it was important that 2D data was being used. Accordingly, even though the presentation failed to mention that FX Energy was using 2D instead of 3D, this omission did not alter the meaning of the slide presentation and was not a fact that had to be disclosed.

The court now turns to Plaintiffs' second main alleged misrepresentation about the chances of success at the wells increasing because of prior successes. As with the first misrepresentation, the court finds no express statement in any of the cited documents that Lugi-1 and Sroda-5 in specific had a greater chance of being successful because of the success of other wells. And as with the first representation, the court is not bound to accept statements alleged in the complaint but that are not actually in the documents on which Plaintiffs relied. See Rapoport, 88 F. Supp. 2d at 184.

Unlike the first misrepresentation, however, it could be reasonable to read several of Defendants' statements as implying that Lugi-1 and Sroda-5 would have a higher chance of success given the success of other wells. And taking as true Plaintiffs' version of the facts, it may be untrue that finding gas in one area increases the chances of finding gas in another area. But even assuming that implied statements are enough to constitute misrepresentations sufficient to state a claim for securities fraud (and the court has found no authority that doing so is proper), the complaint fails to properly plead scienter, as discussed below.

### B. Plaintiffs Fail to Adequately Plead Scienter

The court has concluded that Plaintiffs failed to successfully plead that Defendants made any misrepresentations or omissions. Even if the court's analysis were misplaced, however, the complaint still fails because Plaintiffs fail to sufficiently plead scienter. As mentioned above, to

successfully plead a securities fraud claim, Plaintiffs must allege facts showing a "strong inference" that Defendants acted with scienter. See Tellabs, 127 S. Ct. at 2510. When deciding whether this standard has been met, courts consider both Plaintiffs' allegations of scienter and "plausible nonculpable explanations for the defendant's conduct." Id. at 2510.

Here, it is plausible to read from facts alleged in the complaint that FX Energy drilled the wells at Lugi-1 and Sroda-5 hoping, and even more likely expecting, to find gas. First, one could read the complaint and plausibly conclude that Defendants were convinced that whatever technology they were using to evaluate their prospects at those wells was sufficiently reliable to justify the decision to drill there, even if some more reliable tools were available. And one could also review the complaint and reasonably think that Defendants actually believed that the chance of success of future wells was positively impacted by the successes at previously successful wells. This conclusion is especially so given the amount of times FX Energy publicly made this type of statement. And of course, the plausibility of both of these conclusion is bolstered by the fact that FX Energy and POGC drilled at the sites. In other words, it would be plausible to believe that Defendants believed they were drilling for oil at Lugi-1 and Sroda-5, and not for artificially inflated stock prices.

Accordingly, the court finds that there is a plausible opposing explanation for Defendants' statements, *i.e.*, that the Defendants actually believed that they were true. The inquiry becomes whether a reasonable person would find Plaintiffs' allegation that Defendants acted with scienter "at least as compelling as any opposing inference one could draw from the facts alleged." Id. The court does not believe that a reasonable person would make such a conclusion. To accept Plaintiffs' allegations, one would have to believe that Defendants knew

16

that their information on Lugi-1 or Sroda-5 was unreliable and actually had strong information that those wells were dry, but nonetheless planned to drill there, repeatedly publicized those plans, and then expended significant resources to actually drill there, all on the chance that taking these actions might artificially inflate stock prices.  Moreover, one would have to accept that not only were shareholders misled, but also POGC, which had a major stake in the two wells.  (Either that or POGC was part of the Defendants' scheme and were willing to drill at wells that were probably going to fail to enrich Defendants.)  Absent any other compelling allegations, it would not be reasonable to credit a finding of scienter here.  And Plaintiffs' attempts at making such allegations fail, as described below.

Plaintiffs' first piece of support for their scienter allegations is a confidential witness who allegedly informed Defendants that Lugi-1 and Sroda-5 were bad prospects.  But the court shares the Seventh Circuit's concerns about relying on this source, given that such a witness may "have axes to grind" could be "lying" or maybe "[doesn't] even exist."  Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 757 (7th Cir. 2007).  Accordingly, it is reasonable to apply a steep "discount" to Plaintiffs' unnamed source.  Id.  Moreover, even had the court fully credited the witness' information, it not particularly compelling in support finding scienter here.  For example, the complaint does not make clear to whom the witness spoke, when the conversations occurred, or what was said in response to the witness.  Nor does the complaint state that the witness made any assertions about the wells that a reasonable person would not dispute.  Rather, the complaint describes three opinions held by the witness about the possibility of finding oil at the wells and it appears that Defendants rejected those opinions based on genuine disagreement with them.

As their second group of allegations in support a finding of scienter, Plaintiffs point to the

individual Defendants' stock sales.  The court does not find these sales to be credible evidence of scienter here.  As explained by this court previously, "stock sale allegations have no independent significance.  Stock sale allegations may illustrate that defendants had a motive and the opportunity to commit securities fraud, but they do not show that defendants knowingly made false statements."  Caprin v. Simon Transp. Srvs., 112 F. Supp. 2d 1251, 1259 (D. Utah 2000), aff'd in relevant part and dismissed in part, 99 Fed. Appx. 150, 161 (10th Cir. 2004).  Moreover, there is no allegation that the sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  In re Silicon Graphics Inc. Secs. Litig., 183 F.3d 970, 989 (9th Cir. 1999) (citation and internal quotation marks omitted).  Based on these persuasive precedents, the court is convinced that alleging sales of stock, even large ones, is not relevant to the scienter inquiry without any further context.  And there is no such context in this complaint.

In sum, even assuming that the statements cited by Plaintiffs were false, the court does not believe that Plaintiffs plead sufficient facts to raise a strong inference that Defendants made them with the required state of mind.  This failure is an independent ground to dismiss the Plaintiffs' consolidated complaint.

**IV.    Plaintiffs Fail to State a Claim for Control Person Liability**

As set out above, "a primary violation of the securities laws" is an element a control person liability claim under Section 20(a) of the Exchange Act.  Because Plaintiffs primary violation claim failed so too does the control person claim.

**ORDER**

For the reasons set forth above, Defendants' Motion to Dismiss for Failure to State a

Claim (Dkt. No. 41) is GRANTED.

SO ORDERED this 25th day of June, 2009.

BY THE COURT:

_____
Clark Waddoups
United States District Judge